IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

EVELYN VEGA,                     §
                                 §
          Plaintiff,             §
                                 §
v.                               §      CIVIL ACTION NO. H-13-1665
                                 §
CAROLYN W. COLVIN,               §
ACTING COMMISSIONER OF THE       §
SOCIAL SECURITY ADMINISTRATION,  §
                                 §
          Defendant.             §

<u>**MEMORANDUM AND RECOMMENDATION**</u>

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 8) and Defendant's Motion for Summary Judgment[2] (Doc. 10).   The court has considered the motions, Plaintiff's reply, the administrative record, and the applicable law.   For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

**I.   Case Background**

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant")

---

[1]      This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.   Doc. 5.

[2]      Defendant denominated its motion "Defendant's Brief" and labeled it electronically "Response to Motion for Summary Judgment."   <u>See</u> Doc. 10, Def.'s Mot. for Summ. J.   However, Defendant's filing is clearly a motion for summary judgment, as she requests that the court to affirm the administrative decision. <u>See</u> <u>id.</u> p. 11.

regarding Plaintiff's claim for disability insurance benefits under Title II of the Social Security Act ("the Act").

## A.   **Medical History**[3]

Based on her earnings record, Plaintiff remained insured through December 31, 2010.[4]  She identified September 1, 2010 as the alleged date of the onset of disability.[5]  Thus, the relevant period for determining Plaintiff's disability status is the four-month period, September 1, 2010, through the end of 2010.[6]

Plaintiff's medical history prior to the alleged onset date includes diagnoses of hypertension, gastric bypass surgery, osteoarthritis, peripheral artery disease, chronic alcoholism, and depression/anxiety.[7]

On October 7, 2010, Plaintiff was examined by Balakrishna Mangapuram, M.D., ("Dr. Mangapuram").[8]  At the request of Texas Disability Determination Services ("TDDS"), Dr. Mangapuram performed an internal medicine examination for the purpose of

---

[3]     Plaintiff's husband's name is Paul Stewart.  See Tr. of the Admin. Proceedings ("Tr.") 146.  Throughout the medical records, Plaintiff is variously identified as "Evelyn Vega," "Evelyn Stewart Vega," "Evelyn Vega Stewart," and "Evelyn Stewart."  See, e.g., Tr. 350-55, 358, 361-69.

[4]     See Tr. 11, 143, 173.

[5]     See Tr. 34.

[6]     In order to qualify for disability insurance benefits, the claimant must prove that the onset of her disability was on or before the date on which she was last insured.  Loza v. Apfel, 219 F.3d 378, 394 (5th Cir. 2000).

[7]     See Tr. 234, 253, 280, 364.

[8]     See Tr. 280-83.

determining disability.[9]

Plaintiff's chief complaint at that time was generalized joint pain that increased with changes in weather or in humid, cold conditions and with walking thirty or more feet.[10]  She also complained of bilateral leg pain that increased after standing or walking for five or more minutes.[11]

Dr. Mangapuram observed bilateral lower extremity varicose veins and weak pulses at ankle and foot.[12]  He noted that Plaintiff experienced knee pain when she squatted.[13]  An x-ray of Plaintiff's right knee revealed moderate degenerative changes, according to Dr. Mangapuram.[14]

Dr. Mangapuram found Plaintiff to have a "normal range of joint movements, no evidence of deformity, joint effusion, [or] tenderness."[15]  He also recorded that Plaintiff's spinal movement was eighteen degrees, that the straight leg raising test was negative on both sides, that Plaintiff could bend down to pick up a pen from the floor, that there was no sign of back muscle atrophy, that her shoulder, hip, and hand and wrist movements were

[9]    See Tr. 279-80.

[10]   See Tr. 280.

[11]   See id.

[12]   See 283.

[13]   See Tr. 282.

[14]   See Tr. 283.

[15]   Tr. 282.

normal on both sides, that her neck movement was normal, and that
her ankle/foot and knee movements were normal on both sides with
pain.[16]  Dr. Mangapuram recommended rheumatology, orthopedic, and
vascular surgery consultations.[17]

Regarding Plaintiff's ability to work, Dr. Mangapuram stated:

> Patient can speak normally, can lift, carry and handle
> objects which are less than five [pounds].   Patient
> ambulates without an[] assistive device[].   Can do toe
> and heel walking.  Can do squatting, can do hopping, can
> do tandem and straight walking but has to hold on to
> something.  Patient has normal grip strength.  Ability to
> reach, handle, finger and feel are normal.  Ability to
> button clothes and pick up pencil are normal.[18]

Barbara Hall, Ph.D., ("Dr. Hall") interviewed Plaintiff on
October 28, 2010, and prepared a Psychological Report at the
request of TDDS.[19]  Plaintiff reported that she had been diagnosed
with obsessive compulsive disorder ("OCD") in her late twenties and
that she had struggled with depression and alcoholism for many
years.[20]  Plaintiff attempted suicide in 2005 by ingesting pills but
reported to Dr. Hall that she was not currently experiencing
suicidal ideation.[21]

Plaintiff stated that she performed all the cooking, cleaning,

---

[16]   See id.

[17]   See Tr. 283.

[18]   Tr. 282.

[19]   See Tr. 295-300.

[20]   See Tr. 296.

[21]   See Tr. 296, 298.

and laundering for the household.[22]   Plaintiff also said that she
was able to drive and took her mother to all of the mother's doctor
appointments.[23]   Plaintiff no longer attended church due to leg
pain, she reported, and no longer attended Alcoholics Anonymous
("AA") meetings due to the amount of cigarette smoke.[24]   She
occasionally telephoned friends but rarely visited them at their
houses because she could not "stand to see things out of place."[25]

Dr. Hall opined that Plaintiff appeared capable of completing
activities of daily living, that her thoughts were logical and
coherent, that her intelligence level was average, and her judgment
and insight were poor.[26]   Dr. Hall diagnosed Plaintiff with OCD and
alcohol dependence and determined her Global Assessment of
Functioning ("GAF") to be fifty out of one hundred.[27]   Regarding
Plaintiff's prognosis, Dr. Hall said, "Her condition may be
improved with psychiatric intervention and psychotherapy, and
working a sobriety program."[28]

In November 2010, Plaintiff presented at Oaks Medical Center

---

[22]   See Tr. 297.

[23]   See id.

[24]   See id.

[25]   Id.

[26]   See Tr. 297-99.

[27]   See Tr. 299.

[28]   Id.

with right hip pain that was radiating down her legs.[29]  Tarek
Rafati, M.D., ("Dr. Rafati")[30] diagnosed her with Trochanteric
Bursitis and administered an injection.[31]  Plaintiff was instructed
to continue to take Celebrex and to return to the clinic in two to
three weeks or if the pain increased.[32]  There is no record that she
returned to the clinic for several months.

Plaintiff was seen in early March 2011 at Oaks Medical Center
for moderate knee and back pain.[33]  She was prescribed oral and
topical medications.[34]  A treatment note dated March 25, 2011,
reflected that Plaintiff was seen for severe arthritic pain in her
left knee and swelling of her right knee.[35]  She was continued on
oral and topical medications.[36]

## B.   Application to Social Security Administration

Plaintiff protectively applied for disability insurance
benefits on August 5, 2010, claiming an inability to work due to
OCD, anxiety, depression, osteo-arthritis, peripheral artery

---

[29]   See Tr. 361.

[30]   Although the provider's name is not on the treatment notes from the
November 24, 2010 appointment, Dr. Rafati signed his initials, which are
recognizable from other parts of the medical record.

[31]   See Tr. 325, 361, 372.

[32]   See Tr. 361.

[33]   See Tr. 524-25.

[34]   See Tr. 531.

[35]   See Tr. 522.

[36]   See Tr. 523.

disease, alcoholism, and cysts in her left breast.[37]   In her application, she identified the date of alleged onset of disability as January 15, 2009, but later amended her alleged onset date to September 1, 2010.[38]

In a Function Report, which Plaintiff's husband completed on her behalf about a month after she applied for benefits, Plaintiff described her daily activities.[39] She indicated that she slept four to five hours a night, that she took care of her ill mother and two pets, that she cooked daily for one and one-half to three hours but did not eat much, that she shopped for groceries once a week, that she could work in her garden if she was seated, and that she could drive but did not do so very often.[40]  In addition to going to the grocery store, Plaintiff stated that she could attend church, could visit her mother, and could go to doctor appointments.[41]

As hobbies and interests, Plaintiff listed working puzzles, crosswords, and jumbles as everyday activities but explained that these activities were becoming more difficult each day.[42] Plaintiff

---

[37]   See Tr. 124-25, 146.

[38]   See Tr. 34, 124-25, 143, 147.   The ALJ evaluated Plaintiff's disability status from the original onset date of January 15, 2009, through December 31, 2010.  See Tr. 11.  The attorney amended the onset date at the hearing to September 1, 2010, because Plaintiff turned fifty-five on September 8, 2010.  See Tr. 34.

[39]   See Tr. 166-72.

[40]   See Tr. 166-68.

[41]   See Tr. 169.

[42]   See id.

reported talking on the phone with family members and a friend two to three times a week.[43]   Regarding hygiene activities, Plaintiff said that she frequently lost her balance when bathing and held on to the wall for support, that she brushed her hair in the car because her shoulder hurt, and that she did not shave.[44]

Plaintiff said that her impairments affected her ability to lift, squat, bend, stand, reach, walk, kneel, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use her hands, and get along with others.[45]   She said that she could walk about 150 feet before needing to rest for five to ten minutes and that standing for too long was difficult.[46]

Plaintiff reported that she was forgetful, particularly with doctor appointments and medications, and had trouble keeping track of cooking supplies.[47]   Plaintiff allowed that she could pay attention for fifteen to twenty minutes but did not handle stress or changes in routine very well.[48]   She also reported experiencing suicidal ideation.[49]   She was able to count change, handle a savings account, and use a checkbook or money orders, she said, but could

---

[43]   See id.

[44]   See Tr. 166.

[45]   See Tr. 170.

[46]   See Tr. 166, 170.

[47]   See Tr. 167, 169.

[48]   See Tr. 170-71.

[49]   See Tr. 166.

not pay bills due to a lack of funds.[50]  None of the above abilities was affected by her impairments, according to Plaintiff.[51]

In a disability report completed in January 2011, Plaintiff stated that she could not stand for more than ten to fifteen minutes, could not bend over, had problems grabbing and holding anything heavy due to carpal tunnel syndrome, suffered horrible pelvic pain and did everything at a much slower pace.[52]  She also complained of insomnia, restless leg syndrome, painful varicose veins, numbness in her hands, and a lump in her left breast.[53]

A function report completed at the same time echoed many of her previous complaints.[54]  She advised the Commissioner that she was an alcoholic "recovering for four m[on]ths."[55]  She explained that she could not work because she lacked mobility, could not complete tasks, could not be still due to anxiety, and experienced memory deficiencies.[56]  She described a typical day to include driving her husband to work, picking up her mother and taking her to Plaintiff's house, cooking, picking up her husband from work, driving her mother home, sweeping when she could, mopping, feeding

---

[50]    See Tr. 168.

[51]    See Tr. 169.

[52]    See Tr. 179.

[53]    See id.

[54]    See Tr. 182-89.

[55]    See Tr. 182.

[56]    See id.

the cat and dog, cleaning dishes, and sometimes dusting.[57]  She said, though, that when she was at her worst, she stayed at her mother's while Plaintiff's husband was at work.[58]  Plaintiff helped her mother with housework, doctor appointments, grocery shopping, cooking, hygiene, insurance paperwork, and bills.[59]

Plaintiff reported that she found showering, dressing, caring for her hair, and brushing her teeth difficult and sometimes received help from her husband.[60]  Her husband also helped her keep track of her medications and scheduled doses, she said.[61]  Plaintiff cooked daily for up to four hours preparing meals for her family and her mother, Plaintiff stated, but she needed help to open cans or pick up heavy pots and pans and needed to sit down every ten to fifteen minutes.[62]  She indicated that she was able to wash laundry with the help of her husband, to clean the dishes, to clean and dust the house, to "[p]ull dry leaves or plant small flowers, sweep or rake," but stated that all chores took four times as long as in the past.[63]  In connection with a question about shopping, Plaintiff reported that, if an electric cart was unavailable, she could not

---

[57]   See Tr. 183.

[58]   See id.

[59]   See id.

[60]   See id.

[61]   See Tr. 184.

[62]   See Tr. 183-84.

[63]   Tr. 184.

shop more than one-half hour using the grocery basket as an assistive device.[64]

In contrast to the prior function report, Plaintiff stated that she was unable to handle a savings account or use a checkbook/money orders, explaining that her husband used the computer for these activities and she did not know how to use computers very well.[65] She also said that she sometimes forgot how to do math and forgot appointments for her mother, and got lost while driving.[66]

As far as limitations, she reported that she could not lift more than ten pounds, could not squat, kneel or climb stairs, could not stand for more than ten to fifteen minutes, and could not walk for more than ten minutes.[67]  Other limitations included bending, reaching, hearing, and using her hands, according to Plaintiff.[68] Mentally, she experienced problems with memory, task completion, concentration, understanding, and following instructions.[69] Plaintiff added that she sometimes felt "so depress[ed that she] just want[ed] to end it all," but did not because her mother,

---

[64]    See Tr. 185.

[65]    See id.

[66]    See Tr. 186.

[67]    See Tr. 187.

[68]    See id.

[69]    See id.

children, grandchildren, and husband relied on her.[70]

In November 2010, Mark Schade, Ph.D., ("Dr. Schade") completed a Psychiatric Review Technique Assessment.[71]  Based on Plaintiff's medical record, Dr. Schade assessed whether Plaintiff's psychiatric disposition met or equaled any of the disorders described in the listings of the regulations[72] (the "Listings").[73]  In particular, he considered Listing 12.06 (anxiety-related disorders) for OCD.[74]

Regarding Plaintiff's functional limitations, Dr. Schade found that Plaintiff experienced mild restriction in activities of daily living and mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, with no episodes of decompensation of extended duration.[75]  Dr. Schade concluded that Plaintiff's limitations were not severe enough to meet the Listing, stating that Plaintiff's "functional capacity is no more than marginally impaired."[76]

In September 2011, Dr. Rafati, whose specialty was family practice, completed a Multiple Impairment Questionnaire.[77]  Therein,

---

[70]     See Tr. 189.

[71]     See Tr. 303-15.

[72]     20 C.F.R. Pt. 404, Subpt. P, App. 1.

[73]     See Tr. 303-15.

[74]     See Tr. 308.

[75]     See Tr. 313.

[76]     See Tr. 313, 315.

[77]     See Tr. 394-401.

12

Dr. Rafati listed Plaintiff's diagnoses as osteoarthritis, osteoporosis, depression, anxiety, irritable bowel syndrome, peripheral artery disease, incontinence of bowels and urine, insomnia, and recovering alcoholism.[78] He stated that x-rays showed arthritis in all of her joints.[79] The associated pain and stiffness would produce good days and bad days, Dr. Rafati explained.[80]

Regarding her residual functional capacity ("RFC"), Dr. Rafati opined that Plaintiff could lift (with her right hand) up to ten pounds occasionally and could carry up to twenty pounds occasionally.[81] He opined that Plaintiff could sit for up to six hours in an eight-hour workday and could stand/walk for up to one hour in an eight-hour workday.[82] Dr. Rafati said that Plaintiff needed to stand up and move around every hour and needed to take small breaks.[83] He stated that Plaintiff was significantly limited in her ability to repetitively reach, handle, finger, and lift, in her ability to grasp, turn, and twist objects, and in her ability to use her arms for reaching.[84] He found her to be essentially

---

[78] See Tr. 394.

[79] See id.

[80] See id.

[81] See Tr. 397.

[82] See Tr. 396.

[83] See id.

[84] See Tr. 397-98.

precluded from using her fingers and hands for fine manipulations.[85]
Dr. Rafati also noted psychological and postural limitations, as
well as the need to avoid wetness, noise, temperature extremes,
humidity, dust, and heights.[86]  In response to the query seeking the
earliest date that the description of symptoms and limitations
applied, Dr. Rafati stated, "indefinit[e]."[87]

Defendant denied Plaintiff's application at the initial and
reconsideration levels.[88]  Plaintiff requested a hearing before an
administrative law judge ("ALJ") of the Social Security
Administration.[89]  The ALJ granted Plaintiff's request and conducted
a hearing on December 8, 2011.[90]

## C.  <u>Hearing</u>

Plaintiff and Jessica Earl ("Earl"), a vocational expert,
testified at the hearing.[91]   Plaintiff was represented by an

---

[85]   <u>See</u> Tr. 398.

[86]   <u>See</u> Tr. 400.

[87]   <u>Id.</u>

[88]   <u>See</u> Tr. 49-55, 58-61, 301, 319, 321.

[89]   <u>See</u> Tr. 64-66.

[90]   <u>See</u> Tr. 23-37, 67-68, 94-99.  The hearing was originally scheduled
for August 11, 2011.  <u>See</u> Tr. 72-77, 89.  On that date, Plaintiff, Plaintiff's
husband, and a vocational expert appeared.  <u>See</u> Tr. 38-48.  Plaintiff was not
represented by an attorney.  <u>See</u> Tr. 40-41.  The ALJ postponed the hearing
because he did not have any medical records for 2011.  <u>See</u> Tr. 47.  He explained
to Plaintiff the benefits of having a representative, identified the records that
were missing, and gave her an envelope that would allow her to mail the records
without cost.  <u>See</u> Tr. 40-41, 47.

[91]   <u>See</u> Tr. 23-37.

attorney.[92]

The hearing began with the ALJ asking Plaintiff questions about her age and educational background.[93]   Plaintiff testified that she was born on September 8, 1955, and was fifty-five years old on December 31, 2010.[94]   Plaintiff confirmed that she had graduated from high school and that she had stopped working in January 2009.[95]

The ALJ then turned the questioning over to Earl, who asked Plaintiff about the nature of her past employment.[96]   Based on Plaintiff's responses, Earl offered her opinion that Plaintiff's past job as a housekeeper was an unskilled position performed at the medium level, her past job as a food demonstrator was a semi-skilled position performed at the light level, her past job as a cafeteria attendant was a semi-skilled position performed at the medium level, and her job as a dietary technician was an unskilled position performed at the medium level.[97]

Following Earl's testimony, Plaintiff's attorney led the examination of Plaintiff who testified that she was having a good

---

[92]   See Tr. 25.

[93]   See Tr. 25-26.

[94]   See Tr. 26.

[95]   See id.

[96]   See Tr. 26-28.

[97]   Tr. 28.

day on the date of the hearing because she had been administered "some shots in [her] hips and [her] knee" the previous day.[98]  The pain and swelling that she experienced in her knee, legs, and joints became, in her words, "really bad" in January 2009.[99]  She said that "Dr. Bender"[100] diagnosed her with rheumatoid arthritis.[101]  Plaintiff, who was five-feet tall and "[a]lmost 200" pounds at the hearing, had weighed 140 pounds when the pain intensified in January 2009.[102]  She attributed the weight gain to thyroid problems and irritable bowel syndrome, explaining that her treatment providers were still "trying to figure that out yet."[103]

Regarding her physical abilities, Plaintiff stated that one hour of walking in a day is "a lot" for her, that she could stand for thirty to forty-five minutes at a time, and that she had to sit for two to three hours after standing or walking.[104]  Plaintiff stated that she could not walk as fast as she had been able to in the past, that she could not climb stairs, that she could not lift more than three pounds, that she could not carry anything, and that

---

[98]  Id.

[99]  Tr. 29.

[100]  The court did not locate records from Dr. Bender, and the only mention of him was by Plaintiff at the hearing.

[101]  Tr. 29.

[102]  See Tr. 29-30.

[103]  Tr. 30.

[104]  See id.

16

she easily fell because she had poor balance.[105]  She reported that she did grocery shop but used an electric cart, without which she said she would not be able to shop at all.[106]  She also addressed her past alcohol use, explaining that she was still in recovery and that she had not had a alcoholic beverage in over a year.[107]

The ALJ took over examining Plaintiff to inquire about the side effects of her medications.[108]  She answered that all of her medications caused side effects, specifically, lethargy, drowsiness, water retention, and low potassium.[109]

The ALJ then turned his attention back to Earl and posed this question: "[I]f a person was limited to lifting or carrying about ten pounds frequently or twenty pounds occasionally; standing and walking up to six hours in an eight[-]hour day, with normal breaks; or sitting for six; never climbing ropes, ladders or scaffolding; never kneeling; never crawling; occasionally crouching[,]" could that individual perform any of Plaintiff's past work?[110]  Earl responded that such a person could work as a food demonstrator.[111]

**D.  Commissioner's Decision**

---

[105]    See Tr. 31-32.

[106]    See Tr. 31, 163.

[107]    See Tr. 33.

[108]    See Tr. 34.

[109]    See Tr. 34-35.

[110]    Tr. 35.

[111]    Id.

17

On February 16, 2012, the ALJ issued an unfavorable decision.[112]   The ALJ found that Plaintiff had not engaged in substantial gainful activity from January 15, 2009, through December 31, 2010, and that she had multiple impairments (obesity, disorder of the right knee, and insomnia) that were severe.[113]   The ALJ acknowledged OCD as an impairment but, citing to Dr. Hall's examination on October 28, 2010, found that OCD was not a severe impairment.[114]   The ALJ did not specifically address any other of Plaintiff's alleged impairments.[115]   Plaintiff's severe impairments, individually or collectively, did not meet or medically equal any Listing, according to the ALJ.[116]   The ALJ did not specifically address any particular Listing.[117]

In determining Plaintiff's RFC to perform work-related activities, the ALJ stated that Plaintiff "ha[d] been treated at St. Luke's The Woodland[s] Hospital, Oaks Medical Center, Pinewood Medical Center and seen by Drs. Rafati Tarek [sic] and Rafael Delaflor Weiss."[118]   He briefly discussed Plaintiff's medical treatment on December 7, 2006, and April 8, 2010, as well as

---

[112]   See Tr. 8-18.

[113]   See Tr. 13.

[114]   See Tr. 13-14.

[115]   See id.

[116]   See Tr. 14.

[117]   See id.

[118]   Id.

18

function reports completed by Plaintiff, opinion evidence from Dr. Mangapuram and Dr. Rafati, and the state agency medical consultant's determination.[119]   The ALJ gave Dr. Rafati's opinions less than controlling weight because he found it to be "more limiting than the objective medical evidence of record would support."[120]

The ALJ found Plaintiff capable of performing work at the light level of exertion with the following limitations: (1) never climbing ropes, ladders, or scaffolds; (2) never kneeling or crawling; and (3) only occasionally crouching.[121]   Characterizing Plaintiff's activities of daily living as "fairly normal," the ALJ found that her daily activities "translate[d] to an ability to perform basic work activity."[122]   He also found the routine and conservative nature of her treatment to be an indication that she was capable of performing work-related activities and cited a lack of any restrictions imposed by her treating physicians as further support of this conclusion.[123]

Although the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the

---

[119]   See Tr. 15-17.

[120]   Tr. 17.

[121]   See Tr. 14.

[122]   Tr. 15.

[123]   See id.

alleged symptoms," he found her "statements concerning the intensity, persistence and limiting effects of these symptoms . . . not credible to the extent they are inconsistent with [his RFC] assessment."[124] The ALJ further doubted Plaintiff's credibility, stating, "A review of the claimant's work history shows that the claimant worked only sporadically prior to the alleged disability onset date, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments."[125]

The ALJ relied on the vocational expert's testimony that a hypothetical individual with Plaintiff's RFC could perform Plaintiff's past relevant work of food demonstrator.[126] Thus, the ALJ found that Plaintiff had not been under a disability from January 15, 2009, through December 31, 2010, the date last insured.[127]

Plaintiff appealed the ALJ's decision, and, on April 10, 2013, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[128] After receiving the Appeals Council's denial,

---

[124]   Id.

[125]   Tr. 16.

[126]   See Tr. 17.

[127]   See id.

[128]   See Tr. 1-6, 122.

Plaintiff timely sought judicial review of the decision by this court.[129]

## II.   Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3); see also 42 U.S.C. § 423(d)(5)(A) Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any

---

[129]    See Tr. 1, 3; Doc. 1, Pl.'s Compl.

"substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

## B.  **Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g);

Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.  Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ's decision contains three errors: 1) the ALJ erred in failing to give Dr. Rafati's opinions controlling weight and failing to explain the weight given to Dr. Mangapuram's opinions; 2) the ALJ erred by not finding Plaintiff's mental impairments to be severe; and 3) the ALJ erred in failing to give Plaintiff's subjective complaints greater weight.  Defendant disagrees with Plaintiff on each of the asserted errors, contending that the ALJ's decision is legally sound and is supported by substantial evidence.

### A.  Dr. Rafati and Dr. Mangapuram's Opinions

The ALJ must evaluate every medical opinion in the record and

23

decide what weight to give each.  <u>See</u> 20 C.F.R. § 404.1527(c).
Generally, the ALJ will give more weight to medical sources who
treated the claimant.  20 C.F.R. § 404.1527(c)(2); <u>Greenspan</u>, 38
F.3d at 237 (quoting <u>Scott v. Heckler</u>, 770 F.2d 482, 485 (5th Cir.
1985)); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996).  However,
the treating physician's medical opinion is "far from conclusive"
and will be given less weight when it is "brief and conclusory, not
supported by medically acceptable clinical laboratory diagnostic
techniques, or otherwise unsupported by the evidence."  <u>Greenspan</u>,
38 F.3d at 237 (citing <u>Scott</u>, 770 F.2d at 485); <u>see also</u> 20 C.F.R.
§ 404.1527(c)(2); <u>Newton v. Apfel</u>, 209 F.3d 448, 456 (5th Cir.
2000); SSR 96-6p, 1996 WL 347180, at *3 (July 2, 1996).

The ALJ is required to give good reasons for the weight given
a treating source's opinion.  20 C.F.R. § 404.1527(c)(2);  SSR 96-
2p, 1996 WL 374188, at *5 (July 2, 1996).

> When the determination or decision . . . is a denial[,]
> . . . the notice of the determination or decision must
> contain specific reasons for the weight given to the
> treating source's medical opinion, supported by the
> evidence in the case record[] and must be sufficiently
> specific to make clear to any subsequent reviewers the
> weight the adjudicator gave to the treating source's
> medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).  When the ALJ does
not give a treating physician's opinion controlling weight, he must
apply the factors outlined in the regulations to determine the
weight to give the opinion.  20 C.F.R. § 404.1527(c)(2).  Engaging
in a discussion of these factors is not required unless the ALJ

"summarily reject[s] the opinions of [a] treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant." Newton, 209 F.3d at 458.

Plaintiff contends that the ALJ rejected Dr. Rafati's opinions without providing a sufficient reason for doing so.

Actually, the ALJ considered and discussed Dr. Rafati's opinion testimony and provided good reasons for the weight given to it.  The ALJ found that his opinions were inconsistent with the objective medical evidence.  Inconsistency with objective medical evidence in the record is a specific, legitimate reason to discount the weight afforded a treating physician's opinions.

The court finds substantial evidence to support the ALJ's determination.  For example, an x-ray of Plaintiff's right knee in October 2010 showed moderate degenerative changes.  At that time, Dr. Mangapuram found Plaintiff to have a normal range of joint movements, negative straight leg raising test, no back muscle atrophy, normal neck, shoulder, hip, hand, and wrist movements, normal ankle/foot and knee movements with pain, normal grip strength, normal ability to reach, handle, finger, feel, button clothes, and bend over to pick up a pencil.  He also noted that she could walk without an assistive device, could toe and heel walk, could squat, could hop, could do tandem and straight walking with support.

No medical evidence during the relevant period suggests

25

otherwise.   From September 1, 2010, through December 31, 2010,
Plaintiff had one office appointment with Dr. Rafati.[130]  Other than
that appointment, Plaintiff had a physical examination by Dr.
Mangapuram, a consulting examiner.   The record contains no notes
from any other doctor appointment for Plaintiff's physical ailments
on either side of the relevant period after April 2010 and before
March 2011.[131]

Moreover, the questionnaire completed by Dr. Rafati is dated
September 6, 2011, eight months after Plaintiff's last date
insured.   Nothing in the questionnaire suggested that Dr. Rafati
was contemplating Plaintiff's status during the relevant period.
He listed x-rays and bone density scans as the laboratory and
diagnostic test results supporting his diagnoses but did not
indicate when those tests were performed.[132]   When specifically
asked the earliest date on which the symptoms and limitations
described in the questionnaire applied, Dr. Rafati did not give a
date but wrote "indefinit[e]."[133]  The ALJ could not and the court
cannot now assume that Plaintiff's condition was the same in
September 2011 as it had been in December 2010.

---

[130]   According to the medical records, Dr. Rafati reviewed one set of
laboratory tests in December 2010 and refilled Plaintiff's medications in
September and October 2010, but Plaintiff did not have any doctor appointment
other than the one with Dr. Rafati during the relevant period.  See generally Tr.
231-265, 323-532.

[131]   See generally id.

[132]   See Tr. 395.

[133]   Tr. 400.

Plaintiff also argues that the ALJ did not express what weight he afforded Dr. Mangapuram's opinions and failed to incorporate every limitation Dr. Mangapuram suggested.  The ALJ stated that his RFC assessment was supported by Dr. Mangapuram's findings.  Nothing more was required of the ALJ because Dr. Mangapuram was a consulting examiner, not a treating physician.

Indeed, other than the weight restriction on lifting and carrying, Dr. Mangapuram's opinions support an ability to perform light work, which requires the ability to lift up to twenty pounds at a time and frequent lifting or carrying up to ten pounds, as well as either a good deal of walking and standing or sitting most of the time with some pushing and pulling or arm or leg controls.  See 20 C.F.R. § 404.1567(b).  The ALJ incorporated postural limitations that addressed Plaintiff's pain in her feet, ankles, and knees.

As to lifting and carrying objects, Dr. Mangapuram opined that Plaintiff could only lift, carry, and handle objects that weighed less than five pounds.  This is inconsistent with Plaintiff's own report in January 2011 that she could lift up to ten pounds and Dr. Rafati's opinion almost a year later that she could occasionally lift up to ten pounds with her right hand and occasionally carry up to twenty pounds.  Plaintiff's testimony about her daily activities, which included driving, cooking, sweeping, mopping, cleaning dishes, feeding the pets, grocery shopping, and working in

27

the garden while seated also provides support for the ALJ's finding that Plaintiff could perform light work.  Decisions regarding a claimant's RFC are ultimately reserved to the ALJ.  See 20 C.F.R. § 404.1527(d)(2); SSR 96-5p, 1996 WL 374183, at **2-3, 5 (July 1996).

Plaintiff takes issue with the ALJ's statement that he relied on the opinion of one of the non-examining state agency consultants who indicated on the case assessment form that Plaintiff's impairments were non-severe,[134] arguing that the ALJ could not have relied on that consultant's opinion because the ALJ ultimately determined that Plaintiff's obesity, disorder of the right knee, and insomnia were severe.

The ALJ stated that his RFC assessment was supported by the opinions of the state agency experts and others.  On initial review, Laurence Ligon, M.D., ("Dr. Ligon") viewed Plaintiff's impairments as non-severe.[135]  In his Explanation of Determination, Dr. Ligon noted that Plaintiff's "daily activities [we]re not significantly affected" and that her ability to perform basic work activities was not as limited as she indicated.[136]  Dr. Ligon's opinion supports the ALJ's RFC finding that Plaintiff is capable of light work.

---

[134]   See Tr. 301.

[135]   See id.

[136]   Tr. 55.

### B.  <u>Plaintiff's Mental Impairments</u>

At step two of the disability analysis, an ALJ considers whether the claimant has a medically determinable impairment or combination of impairments that are severe.  20 C.F.R. § 404.1520(c); <u>see also</u> 42 U.S.C. § 423(d)(2)(A), (B).  Severity is determined by whether the impairment or combination of impairments significantly limits the claimant's physical or mental ability to perform basic work activities; an impairment or combination of impairments is not severe when evidence establishes only a slight abnormality that would only have a minimal effect on the claimant's ability to work.  20 C.F.R. § 404.1521; SSR 85-28, 1985 WL 56856, at *3 (1985); SSR 96-3p, 1996 WL 374181, at *2 (July 2, 1996).

The regulations set out a "special technique" for evaluating the severity of mental impairments.  <u>See</u> 20 C.F.R. § 404.1520a. The first step of the technique is to determine whether the claimant has "a medically determinable mental impairment[]" based on the "pertinent symptoms, signs, and laboratory findings."  20 C.F.R. § 404.1520a(b)(1); <u>see also</u> <u>Randall v. Astrue</u>, 570 F.3d 651, 658 (5th Cir. 2009).  If a medically determinable mental impairment is identified, the ALJ must rate the degree of functional limitation "based on the extent to which [the claimant's] impairment(s) interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained

basis." 20 C.F.R. § 404.1520a(c)(2); see also Randall, 570 F.3d at 658.

Four areas are considered in rating the degree of functionality: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The rating is then used to determine the severity of any mental impairment. See 20 C.F.R. § 404.1520a(d). According to the regulation, if the degree of limitation in the first three areas is rated as "none" or "mild" and in the fourth area as "none," then the claimant's mental impairment(s) is generally considered "not severe." 20 C.F.R. § 404.1520a(d)(1).

The regulation promises claimants that the application of the technique at the ALJ level of review will be documented in the decision. 20 C.F.R. § 404.1520a(e).

> [T]he written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas . . . .

20 C.F.R. § 404.1520a(e)(4). Other circuits have interpreted the regulation to require remand where the ALJ does not comply with the regulation except in circumstances where the error was harmless. See Kohler v. Astrue, 546 F.3d 260, 266-69 (2ᵈ Cir. 2008)(discussing similar approaches of other circuits and remanding

the case before it because the ALJ's failure to apply the special technique as outlined in the regulation was not harmless under the facts of that case).

Plaintiff argues that the ALJ erred in not finding her mental impairments severe based on the opinions of Drs. Hall and Rafati and that the ALJ committed an error that requires remand by failing to apply 20 C.F.R. § 404.1520a.

Addressing the latter issue first, the court finds that the ALJ did not follow the black letter of 20 C.F.R. § 404.1520a in that he did not "include a specific finding as to the degree of limitation in each of the functional areas." 20 C.F.R. § 404.1520a(e)(4). Plaintiff acknowledges that the Fifth Circuit has not expressed an opinion on when remand is necessary based on an ALJ's failure to comply precisely with 20 C.F.R. § 404.1520a. Kohler and cases cited therein leave open the option not to remand when the ALJ's noncompliance is harmless. See Kohler, 546 F.3d at 266-67, 269. In the two district court cases cited by Plaintiff, remand was not based solely on the ALJ's failure to discuss the special technique in his decision but on a failure to fully and fairly evaluate the facts related to disability. See Cannon v. Astrue, Civil Action No. H-08-2847, 2009 WL 2448261, at **4-5 (S.D. Tex. Aug. 6, 2009)(unpublished); Costanzo v. Astrue, Civil Action No. G-07-418, 2009 WL 914053, at *14 and n.12 (S.D. Tex. Mar. 31, 2009)(unpublished).

In this case, the ALJ's error was harmless, and his conclusion that Plaintiff's mental impairments were not severe is supported by substantial evidence.  At the severity step of the analysis, the ALJ discussed Dr. Hall's evaluation, which specifically addressed each of the areas of functionality.[137]  In that discussion, the ALJ incorporated pertinent findings and conclusions that were based on the technique and touched on two of the functional areas, social functioning and concentration, persistence, or pace.  He also noted that Plaintiff had not received any psychological treatment, implicitly ruling out any episodes of decompensation.  He addressed Plaintiff's activities of daily living at a later point in his decision, referring to them as "fairly normal."[138]

Moreover, Dr. Schade completed a Psychiatric Review Technique in November 2010 at the initial-review level and found Plaintiff to be only mildly limited in activities of daily living, social functioning, and concentration, persistence, or pace, with no episodes of decompensation of extended duration.[139]  Per the

---

[137]   Dr. Hall did not provide a scale rating pursuant to 20 C.F.R. § 404.1520a, but she did summarize her opinions regarding Plaintiff's functional limitations in each of the four areas outlined in the regulation.  See Tr. 297.

[138]   Tr. 15.

[139]   Dr. Schade specifically addressed only the Listing for OCD.  The court notes that, in her argument, Plaintiff does not discuss what mental impairments she contends are severe.  When she applied for benefits, she identified OCD, depression, and anxiety as severe mental impairments.  Dr. Rafati diagnosed her with depression/anxiety, and Dr. Hall diagnosed her with OCD.  The ALJ addressed only OCD in his step-two analysis.

The particular mental impairment(s) is immaterial at step two because the analysis contemplates the combined effect of all of the individual's impairments. 42 U.S.C. § 423(d)(2)(B).  The analysis of the degree of functional limitation reflects the same consideration.  See 20 C.F.R. §404.1520a(b)(2) (discussing

regulation, he concluded that Plaintiff's mental impairments were nonsevere.[140]

The medical evidence of record and the absence of mental health treatment support the ALJ's determination. Dr. Hall found Plaintiff capable of completing activities of daily living and found her thoughts to be logical and coherent, despite assigning her a GAF score at the upper end of the severe category. She noted that Plaintiff stopped going to church and to AA meetings for reasons unrelated to her mental health. Dr. Hall opined that Plaintiff's condition could improve with mental health treatment. Dr. Rafati treated Plaintiff's mental impairments conservatively with medication only, never referring her to a mental health provider or suggesting therapy.

The record contains no evidence of any treatment or intervention by mental health providers at any time near the relevant period. By her own account, Plaintiff engaged in social interactions with family members on a daily basis, assisted her mother with insurance matters, and transported her to doctor appointments. Plaintiff also completed many household chores, as well as grocery shopping and caring for pets. Taken as a whole, the record evidence amounts to much more than a scintilla of evidence in support of the ALJ's severity determination.

---

rating the "degree of functional limitation resulting from the impairment(s)").

[140]   The ALJ did not discuss Dr. Schade's analysis, but the ALJ did generally refer to reliance on the state agency experts.

### C.  Plaintiff's Subjective Complaints

The  regulations  explain  that,  when  the  medical  evidence
reveals a medically determinable impairment that could produce pain
or  other  symptoms,  the  analysis  is  to  focus  on  the  intensity,
persistence,  and  limiting  effects  of  the  complained-of  symptom  to
determine  how  it  limits  the  claimant's  capacity  for  work.    20
C.F.R. §  404.1529(c)(1);  see also  SSR  96-7p,  1996  WL  374186,  at
**1-2 (July 2, 1996)(clarifying 20 C.F.R. § 404.1529(c)).  In order
to evaluate the intensity, persistence, and limiting effects of the
pain or other symptoms, the ALJ considers all available evidence,
including  medical  history,  medical  signs  and  laboratory  findings,
and statements of treating providers, and the subjective testimony
of  the  claimant.    20  C.F.R.  §  404.1529(c);  see also  SSR  96-7p,  1996
WL 374186, at **1-2 (July 2, 1996).

The  ALJ  must  make  a  credibility  finding  any  time  a  claimant's
subjective  testimony  is  not  substantiated  by  objective  medical
evidence.  SSR 96-7p, 1996 WL 374186, at **2, 4 (July 2, 1996).  In
addition  to  the  objective  medical  evidence,  the  ALJ  must  consider:
(1)  the  claimant's  daily  activities;  (2)  the  location,  duration,
frequency  and  intensity  of  the  claimant's  symptoms;  (3)  factors
that precipitate and aggravate the symptoms; (4) the medication the
claimant takes and any side effects; (5) other treatment that the
claimant  has  received  for  relief  of  the  symptoms;  (6)  any  other
measures  used  by  the  claimant  for  relief;  and  (7)  any  other

34

relevant factors.   20 C.F.R. § 404.1529(c)(3).   Other factors may include consistency, both internally and with other record evidence, treatment history, other sources of information, and observations of the claimant.   SSR 96-7p, 1996 WL 374186, at **5-8 (July 2, 1996).

The ALJ must articulate the reasons for the credibility finding in his decision.

> It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."   It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.   The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Id. at *4.   Although the ALJ is required to consider subjective evidence of pain and other symptoms along with other record evidence, he has the discretion to determine whether pain and other symptoms are disabling.   See Wren, 925 F.2d at 128.   "While an ALJ must consider an applicant's subjective complaints of pain, he is permitted to examine objective medical evidence in testing the applicant's credibility.   He may find, from the medical evidence, that an applicant's complaints of pain are not to be credited or are exaggerated."   Johnson v. Heckler, 767 F.2d 180, 182 (5th Cir. 1985).

Here, Plaintiff argues that the ALJ provided insufficient

bases for finding Plaintiff's testimony less than fully credible.

The ALJ followed the regulations and supporting legal authority by, first, determining that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" and, then, evaluating the medical records, the treatment notes of Plaintiff's physicians, and Plaintiff's subjective complaints.[141]   The ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment."[142]   While this statement was insufficient on its own to explain the ALJ's credibility assessment, the following paragraphs, in which the ALJ thoroughly discussed his reasons for discounting Plaintiff's subjective complaints, fully complied:

> The claimant has testified to fairly normal activities of daily living, which translate to an ability to perform basic work activity.  She takes care of her mother who has been diagnosed with cancer.  She drives her husband to and from work and shops for groceries.  She needs some assistance with personal care but is able to maintain her house by dusting, mopping, sweeping and cleaning.  She is also able to prepare meals.  These daily activities are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.
>
> Although the claimant has received treatment for the allegedly disabling impairment(s), that treatment has been essentially routine and/or conservative in nature. There is no indication in the medical records that any of

---

[141]    Tr. 15-17.

[142]    Tr. 15.

> the claimant's treating physicians gave any opinion on the claimant's ability to work.  Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor.  However, a review of the record in this case reveals no restrictions recommended by the treating doctor.
>
> A review of the claimant's work history shows that the claimant worked only sporadically prior to the alleged disability onset date, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments.[143]

The guidelines require that an ALJ consider the 20 C.F.R. § 404.1529 factors but do not require a discussion of each in the ALJ's decision.  The court must assume that the ALJ here considered the factors because he said that he did and because he touched on several, including daily activities, frequency and intensity of Plaintiff's symptoms, consistency, and treatment history.

Plaintiff may disagree with the reasons given by the ALJ, but the ALJ's determination in this case was grounded in the evidence, and his well-articulated decision included specific reasons for his finding.  As discussed by the ALJ and in other parts of this memorandum, Plaintiff's daily activities alone suggest the ability to perform basic work activities at the light level.  Ultimately, it was the ALJ's task to assess Plaintiff's credibility with regard to her subjective testimony on symptoms and their functional effects, and that decision is entitled to deference.  See Falco v.

---

[143]     Tr. 15-16.

<u>Shalala</u>, 27 F.3d 160, 163-64 (5th Cir. 1994); <u>Wren</u>, 925 F.2d at 128.

## IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.  Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this <u>14th</u> day of August, 2014.

_____
U.S. MAGISTRATE JUDGE